The last case of the morning is Collier v. Dallas County Hospital District, No. 19-10761. Plaintiff Robert Collier appeals to this court not to create new Title VII law in this circuit, but to simply enforce existing Title VII jurisprudence. There are two issues in which the District Court erred in granting summary judgment on behalf of Appellee Parkland Hospital. First, the District Court erred and created a reversible error in deciding that summary judgment was appropriate for Plaintiff Collier's retaliation claim. Secondly, the District Court committed a reversible error when it relied on an opposite case and on bad law for finding that a hostile work environment claim could be summarily adjudicated in Mr. Collier's case. Turning to the hostile work environment claim first, the Court relied specifically on the Hudson opinion in finding that the hostile work environment was appropriately adjudicated on summary judgment. The Court stated on page 31 of its opinion that the racial graffiti that Collier experienced at Parkland Hospital and that he witnessed does not rise to the level of creating a hostile work environment, even though the Court assumed for the purposes of deciding defendant's summary judgment motion that the graffiti depicting swastikas could be interpreted as offensive to Collier based on his African-American race. Nonetheless, the Court noted that Collier has not produced any evidence that any of the graffiti at Parkland was directed towards him, using that language, directed towards him. They were in some kind of closet, right? No, Your Honor, they were actually in an operating room that was not functioning as an operating room at the time and so was being used for storage. Storage. And because Mr. Collier was an operating room aide, it was part of his job to go into that operating room when he was assigned to that unit multiple times per day. Was he the only African-American employee? He was not the only African-American employee. Anyone else, did he ever complain about this before the events that led to his termination? Absolutely. He did as part of the Parkland Code of Conduct. He is allowed to make a complaint through numerous channels, and he complained specifically to the director of the operating room, who was in charge of 150 employees, Mr. Stetzel. And he complained to Mr. Stetzel directly about the swastikas. But more importantly, Your Honor, beyond the complaining process is the fact that the district court relied on an erroneous ruling that the swastikas and the N-word graffiti that Mr. Collier experienced had to be specifically directed to him. This court in Donaldson v. CDB held that the Fifth Circuit has long held that harassment does not have to be directed toward the plaintiff to be considered for a hostile work environment claim. But that's not what the district court did here. Does it make it more severe, though, when it is directed at someone? I mean, that just seems fairly basic. It is appropriate, Your Honor, for a district court to consider different weights to be given to different factors. And absolutely, if the swastika was written saying, Mr. Collier, this is for you, it would be considered to be directed towards him and more significant. But in this case, Your Honor, it can also be deemed to be directed at Mr. Collier because after reporting the swastika, Mr. Stetzel continued to require that Mr. Collier work in that same operating room for over six months. And that swastika remained up for over one and one-half years before Parkland Hospital did anything to address it. And there is no Fifth Circuit authority that allows for racial graffiti once reported of. Are there pictures of these? I guess there are no pictures of these in the record. There is a picture of this in the record, Your Honor. Okay. How big is it? They are two feet by two feet square. And Mr. Stetzel, the operating room director for Parkland Hospital, in addition to those photos, testified that he saw the swastikas himself. He saw and described them in the record as two feet by two feet square. And that when he saw those swastikas, he decided at that moment that when the operating room was remodeled, he said in about six months, that he would take care of it through the remodeling process. What operating room director Stetzel of Parkland Hospital did not do was take a picture of the swastikas, investigate the swastikas, report the swastikas to human resources, report the swastikas to his own supervisors, or conduct an investigation. The only thing Mr. Stetzel did on behalf of Parkland Hospital was require the appellant, Mr. Collier, to continue to work in that room for six months. So to answer your question, Your Honor, because management required Mr. Collier to continue to work in that environment, they did, in fact, direct that swastika and racial graffiti to him. How long was the N-word kept up after his complaint? What was the timing on that? Roughly three months, Your Honor. And it was only removed by how Mr. Collier described as a rough scratching. It was, the N-word was written into the elevator in the hospital. So you imagine the metal plate on an elevator. It was written into that. It was never removed. It was never painted over. Ultimately, somebody took a sharp object and just scratched through it. And that's how it was removed from the staff elevator. Mr. Collier could have done that himself, couldn't he? He, I suppose, could have, Your Honor, but according to Parkland's own requirements, it was not on the employee to do that. It was on the employee to report it. Further, the court relied on Hudson v. Clico, which is a decision from 2013, a panel Judge King and which you sat. And there, the summary judgment was upheld in a case involving a noose. But importantly, in that case, the Hudson plaintiff never saw the noose, never reported the noose, and wasn't even at work the day the noose was found. That's the case that this court, the district court, relied on for saying why summary judgment should be granted. But the facts here are completely different. If you look to the record citations, pages 263 through 265, Mr. Collier saw that racial graffiti multiple times per day, multiple days per week. Is that what triggered the event where he started kicking in the wall, punching in the wall? He did strike the wall, Your Honor, and it was, he would testify, an overarching concern of being repeatedly told, even though he complained to management, to human resources, to the 1-800 number that Parkland Hospital provided. Even though he complained time and time and time again, and none of his complaints were investigated, yes, Your Honor, that did lead to his frustration. I assume that this screaming incident and punching in the wall must have occurred in front of patients. There's no evidence in the record to suggest that it did. Well, why would there not have been patients unless he was working in the night shift? Well, Your Honor, it's a very large hospital, and there are many hallways. The video evidence of the wall-punching incident, for example, was down a hallway off a small corridor, not unlike the small hallways down the corridor of this courtroom. And so there's no evidence in the record that this was done in front of patients that I am aware of. But importantly, Your Honor, what was found is that the district court relied on cases that are an opposite from the case here and, as importantly, relied on a 1982 opinion of this court, the Vaughn case, that has been expressly disapproved of by the Supreme Court. The district court in this case expressly said that summary judgment was granted because even if Mr. Collier was exposed to graffiti while at work, and this is on page 31 of the opinion, for the severity and pervasiveness of a term, condition, or privilege to indicate a hostile work environment, the work environment must be so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers. The district court cited that 1982 opinion but ignored the precedent set by the Supreme Court in a unanimous decision 11 years later in Harris v. Forklift. And there Justice O'Connor, writing for the court, stated that the district court in that case erred in relying on whether the conduct seriously affected plaintiff's psychological well-being or led her to suffer injury. Such an inquiry may needlessly focus the fact finder's attention on concrete psychological harm. An element Title VII does not require. So long as the environment would reasonably perceived and is perceived as hostile or abusive, there is no need for it to also be psychologically injurious. The district court in this case ignored that Supreme Court precedent and instead required that Mr. Collier express that psychological harm that the Supreme Court expressly disavowed and for that reason committed reversible error on that point. The district court also ignored the fact that there is evidence in the record, even if the court is to assume that psychological injury is required, there is evidence in the record that Mr. Collier did experience psychological injury and the court ignored that. Turning your attention to record sites 316 through 317, Mr. Collier testified that he sought medical treatment for anguish and pain and suffering from the pastoral counseling center. That he had his mental state affected. That he had headaches and suffered from lack of sleep and that it was constantly in his thoughts and missed work as a result of the racial discrimination that he suffered in Parkland Hospital. All of that was ignored by the district court. And instead they focused on an outdated and overruled test. The problem with doing so was also outlined by Justice O'Connor. And that's that, as she wrote, the district court did not conclude that the work environment was not intimidating or abusive to Harris. It did so only after finding that the conduct was not so severe as to be expected to seriously affect plaintiff's psychological well-being. The district court's application of these incorrect standards may well have influenced its ultimate conclusion. So what Justice O'Connor was pointing out in the Harris case is that once you go down this road of assessing the plaintiff's psychological well-being, it clouds the entire assessment of the case. Well, are you going on work environment or are you going on your retaliation claim? I'm moving directly to the retaliation claim now, Your Honor. Because it is that analysis that the district court here had regarding the hostile work environment claim that also colored the district court's analysis of the retaliation claim. Here the district court committed reversible error when it granted summary judgment as to Mr. Collier's claim of retaliation. Because it improperly weighed evidence that should have been more properly weighed by the jury. Specifically, Parkland Hospital thought that Robert Collier was a troublemaker. There's testimony in the record that operating room director Stetzel said that he thought that human resources must have talked to him 20 or 30 times about Robert Collier during his seven years working for Parkland Hospital. So the fact that there were so many complaints of racial discrimination, instead of leading to investigations by Parkland Hospital, led them to believe that Mr. Collier was a troublemaker. There was no discussion in the district court's summary judgment opinion of these facts in the record, which a jury should have been allowed to consider. And I'm referring to record sites 808, 810, 817, 255, 257, 260, and 1487. Where Mr. Collier's supervisors testified that they did not escalate plaintiff's complaints of racism to human resources, even though their own policies required it. The supervisors testified that they were tired of plaintiff complaining about racial discrimination. His supervisors testified and admitted that they called the police on the day that he was terminated because of his complaints of discrimination. The plaintiff repeatedly explained that on the day of the termination that the defendant and the plaintiff had completely different viewpoints of what in fact happened. And what we do know, and what Director Stetzel testified to himself, is that plaintiff complained about swastikas and graffiti to him directly. So that is the pretext that a jury should have been able to consider about whether or not plaintiff's write-ups were in fact pretext for his ultimate termination. The plaintiff testified, and I'm referring to record sites 246, 280, through 281. The plaintiff testified that both times he was disciplined for not answering his radio, they didn't work. And there is in fact evidence in the record at 1487. At least one of those incidents there, they also paged him over the intercom. That is defendant's testimony, but the plaintiff disputes that, Your Honor. What is not disputed at 1479 and at 1510 is that the defendant admitted that they had issues with those radios working. And in fact, on another occasion for plaintiff's second write-up, the defendant attempted to discipline the plaintiff for not answering the radio when they later admitted the radios didn't work that day. And that's at record site 281 to 282. A jury should have been allowed to consider whether or not pretext occurred when Mr. Collier was written up, when his supervisors testified over and over again that they were tired of his complaining of racial discrimination. Instead, the district court weighed the evidence inappropriately, discounted evidence in favor of Mr. Collier, and ruled instead that there was no pretext when the record is replete with examples that a jury should have been allowed to consider. And so for those reasons, and also because the court relied on an opposite authority, we ask that summary judgment be reversed and remanded. Thank you very much. Ms. Hernandez. May it please the court. Your Honors, I will, since the appellant addressed the hostile work environment claim first, I will address that. I represent what was the defendant, Dallas County Hospital District, and the district court carefully considered all the evidence that was before it in the record and properly granted summary judgment against Mr. Collier's hostile work environment claim. He properly found that Mr. Collier failed to show the fourth element necessary to establish a hostile work environment claim as a matter of law, which is that the harassment he complains of affected a term, condition, or privilege of employment. Now, in assessing whether or not he established that element, Judge Fitzwater properly considered the totality of the circumstances, including each conduct's frequency, each conduct's severity, whether it was physically threatening or humiliating to Mr. Collier, or a mere offensive utterance, and also whether it unreasonably interfered with Collier's work performance. How do we evaluate the frequency of something? I mean, you know, with verbal comments or oral comments, it's pretty clear how many times a person says it. With something like this graffiti that stays there but it was only put there once, how do we, but then he complains and it's not removed, how do we evaluate the frequency of that type of conduct? Yes, Your Honor, and I would like to talk about those two graffiti incidents. So the N-word that he claims was scrawled into the elevator that he saw for three months. When, in even the cases that they cite too, when they consider graffiti like that, it's not just enough for there to be the N-word. And even the cases they cited, it was coupled with threatening language. For example, in the Watson v. Siva logistics case from this circuit, 619F936, a fact issue was found where the graffiti appeared in several locations, like KKK, I hate N-words, were carved into something that was a stall in the locker room that the employees saw on a daily basis, that even management saw on a daily basis. There was also evidence of the words KKK, N-word, written into the employees' lockers themselves. There was evidence in the bathroom stalls, not just saying the N-word, but threatening language. Hang an N-word today. Kill the N-word. You say just saying the N-word. You know, Justice Kavanaugh has an opinion, it's not our law, but when he was on the D.C. Circuit, that said since the standard is severe or pervasive, and that's the most racially inflammatory word in the English language, that it's pretty much de facto severe. You have that coupled here with the most inflammatory racial slur with probably the most hateful racial symbol. How is that not severe? And I would just also remind the Court that there's an objective prong to the standard and a subjective prong. And as Judge Costa, you mentioned, while it may be sufficient under the objective prong, Mr. Lear also still has to show that it subjectively affected him. They side to the Harris v. Forklift case, and they say that the district court required him to show that he was psychologically unstable. That's simply not true. The fact that Judge Fitzwater considered how it affected him at work and whether it psychologically affected him does not mean that he required Mr. Collier to show that or that that was somehow dispositive. And even the Supreme Court in the Harris case said, it reaffirmed that we do not require the employee's psychological well-being or the plaintiff to suffer injury, but the effect of the employee's psychological well-being is still relevant and it may be taken into account. And it reaffirmed at page 370 of that opinion, that a mere utterance of an epithet which engenders offensive feelings is not sufficient to affect the conditions of employment. It has to be both objectively hostile or abusive and subjectively perceived to be abusive in order to actually alter the conditions of employment, which is their burden to show. What exactly did Mr. Collier do as an operating room tech? Yes, Judge Jones. As an operating room tech, he had a very important job because the operating room aides are responsible for turning over the operating rooms, cleaning them, getting them ready for the next surgical medical procedure, making sure supplies are staffed, delivering laboratory specimens from those rooms. And at the point in time that's relevant, 2015 and 2016, the operating rooms were assigned by working in certain pods. And those pods handled different kinds of medical procedures. What did Pod D do? I can't remember what Pod D specifically did, Your Honor. I apologize. But he was responsible for doing all those things, delivering the laboratory specimen and helping the patients go from the procedure to a hospital room if they were not immediately dismissed. Excuse me. Is there any evidence about how many times he had to go into this non-used operating room where the swastikas were? Yes, Your Honor. The evidence, assuming all the facts in the light most favorable to Mr. Collier, his testimony was that he saw it for six months once a week when he was assigned to work in Pod C, which was allegedly the pod that unused room was you had to access that room to get the supplies to do what you needed to do in Pod C. So once a week when he was assigned to Pod C for a six-month period is when he would go into this room that held the swastikas. And that testimony is in the record. At 849, he also talks about how it was drawn on sheetrock because it's not disputed that this was an unfinished room. It was a room that was not supposed to be used. In fact, the ceilings were not even in this room. The swastikas were drawn on the sheetrock. There was no wall there. And that's in his testimony at 851, where he says he saw it once a week when he was assigned to work in Pod C is at 856 in the record. And he also testified that seeing it only affected him by one percent. And that is fatal in his requirement in being able to show that it unreasonably interfered with his work, something that Mr. Fitz, I apologize, that Judge Fitzwater also properly considered. None of the cases they cited to in their brief or their reply brief would support, even if you assume all these facts are true, that he was called a boy by a nurse co-worker one time, that he saw the N-word in the elevator for three months, that he saw the swastika graffiti as we've just described. There are no cases that would support that that is sufficient to create a fact issue as to a hostile work environment. And certainly they did not cite to any for this court. This case is more like Brooks versus Firestone polymers, 640F Approximate 393. This came from the Fifth Circuit, where they affirmed summary judgment. And now that case involved the claims of multiple plaintiffs. But for one of the plaintiffs, they found racial slurs and blackface drawings in the bathroom and the employer's delay in painting over those bathroom stalls. Along with there was evidence that the manager said as long as he was in charge, there would be no blacks in the control room. The court found while offensive and reprehensible, these were isolated as incidents, offhand remarks, and they considered the fact that none of these allegations involved physical threats. They were not addressed directly to the plaintiff and did not appear to interfere with his work. Well, they certainly require the bias response team. You didn't hear the previous argument. I apologize, Your Honor. I was focused on getting ready for this one. So I think it's just completely improper to say that the lower court applied the wrong standard. The opinion shows Judge Fitzwater carefully considered all the evidence, the totality of the circumstances. There's just no case law, and it's simply not sufficient here that he's established a fact issue as to whether or not the harassment affected a term or condition of employment. Moving on to the retaliation claim, Your Honors. Now, what's relevant to the retaliation claim is a final warning he got on August 24, 2015, and his termination, which happened on July 12, 2016. Now I'll address these issues separately. First, Mr. Collier received the final warning on August 24, 2015 for incidents that occurred on August 6, where he failed to respond to his supervisor, Javier Reyes's calls on the radio, and was seen punching the wall numerous times. It's undisputed Mr. Collier punched the wall. It's undisputed that this was inappropriate and unacceptable behavior in violation of the colleague behavior expectations policy of the hospital, and that issuing him a final warning was appropriate and consistent with Parkland's corrective action policy. The corrective action policy can be found in the record at 1059. The colleague behavior expectation policy can be found at 969 to 972. And Mr. Collier's testimony that punching the wall was inappropriate and unacceptable can be found in the record at 883. And there are numerous places where he admits to punching the wall, but they also admit that in their brief. Now, given all of this, it's established very well that an employee's failure to follow the employer's policies, the employer disciplining the employee pursuant to its policies, is a legitimate, non-retaliatory reason. Collier's admissions to all of this is fatal. Now here's what he tries to say in order to make this argument that there's a substantial conflict in the evidence where there is none. First, he alleges, with regard to Mr. Reyes, he says he made numerous complaints about Mr. Reyes favoring Hispanic employees and that Mr. Reyes had knowledge of these complaints. Now, at the time of the final warning, which was August 6th, it's undisputed Mr. Reyes had just been his supervisor for one day. He had just been appointed to the supervisor position on August 5th, and that's in the record at 1177 and 964 to 966. There is no evidence in the record that Mr. Reyes had any knowledge of any complaints made against him by Collier or that Collier even made any complaints against Mr. Reyes to anyone at Parkland at this point in time. It's also undisputed. I believe this absolutely needs to be corrected for the court. Opposing counsel said that we never investigated any of these complaints, and that's simply not true. In fact, all of the investigations are actually attached to exhibits to their appendix to their summary judgment response. Each of these complaints was thoroughly investigated by Employee Relations Advisor Cassandra Henderson and, at times, Employee Relations Director Arthur Farrell when it came to the final warning and termination. And it's undisputed that Human Resources investigated this punching-of-the-wall incident, not answering the phone, and recommended a final warning be issued. Mr. Stetzel made that decision, not Mr. Reyes. Mr. Reyes was not a decision-maker for the final warning. So all these allegations about, oh, Mr. Reyes, I complained about him, and he knew, that's simply not true and not relevant for the final warning consideration. Now, he also mentioned that he had hard, concrete proof that the radios were not working when he got the final warning. And that's not true either. What he cites, too, in his brief in support of that allegation, is testimony that Director Stetzel made when he was asked about a complaint Mr. Collier made months after the final warning incident in November 2015. The investigation file, which they also attach in 1499 to 1510 in the record. Now, what happened with that incident is Mr. Collier made a report to the Parkland Integrity Line, as employees are allowed to do, because Mr. Stetzel had asked him to provide a written statement explaining why he did not respond to his radio at the end of October. And when Human Resources investigated this, Mr. Stetzel said, well, I ultimately did not discipline Mr. Collier for this, because I found out that other employees, when I asked them to write statements as well, their radios were not working either, so Mr. Collier was not disciplined for this at all. That testimony about the radios not working at the end of October 2015 has nothing to do with him not responding to his radio on August 5th of 2015. So he has no evidence supporting that. So then what are you left with on the final warning? It's that he disputes that he got called on the radio. That's it. But he certainly does not dispute that he punched the wall and that that was in violation of Parkland's policies. And Parkland has sufficient evidence in the record that it reasonably relied upon Human Resources' investigation in issuing him a final warning consistently with its policies. Moving on to the termination. And I think it's also important to note for the Court that there are two different police reports, because there have been times where different ones have been cited for different purposes. There was a police report involved with the punching of the wall incident, because the police were called by Mr. Stetzel after he punched the wall, and actually Mr. Collier himself voluntarily and affirmatively went to the police department after punching the wall. And then there's also the police report involved with the insubordination incident. Now, Judge Fitzwater correctly found that Mr. Collier's termination was not a pretext for retaliation. Mr. Collier was terminated because he was insubordinate and failed to work in an assigned work area as directed by not only his supervisor, Mr. Reyes, but also two other perioperative leaders. Now, I want to go into detail about what happened this day, because I do believe it's relevant in assessing whether or not there's a fact issue. Human Resources once again investigated the termination incident. The incident occurred on June 30th of 2016. They looked at Mr. Reyes's statement, which is in the record at 1189 and also 1183 to 1184, where he explained, it was a day like any other day. I gave all the operating roommates their assignments. I assigned Mr. Collier to work in Pod D, and he simply did not want to work there. And so ultimately he's not able to get Mr. Collier to work there, so then they decide let's go talk to the next level of management, Director Richard Stetzel. When they go to Director Richard Stetzel's office, he's not there, but the unit manager, Nore Kuloglu, whose statement was also part of Human Resources investigation, and in the record at 1197 to 1198, she talks about in her statement that Mr. Collier was upset about his pod assignment. In fact, he couldn't even sit down. He was pacing in her office. He was angry. He would not listen. She had to repeatedly calm him down, remind him of the colleague behavior expectations policy, remind him, and most importantly, that the patients need you to be there, so you need to go there. At some point he gave his radio to her, and he took it back once she was able to calm him down, and it appeared that he had gone, finally, to his Pod D. Later on in the day, Mr. Reyes sees that Mr. Collier is not in Pod D. He's socializing with another operating roommate. His name is Gary Smith, who also provided a statement, which can be found in the record at 1076 and also 1194. He's socializing with Mr. Smith in Pod A. He tells Mr. Collier, look, you can't be here. You need to go to Pod D. Words are exchanged, and from what Mr. Reyes stated was that this is when he became threatening. He clenched his fist. He started walking towards him, cursing at him. All of this is happening outside of Director of PERI-OP Margie Karamucci's office, who also provided a statement, which can be found in the record at 1191 to 1193, where she says she overheard a commotion outside of her office. She goes out. She sees Mr. Reyes and Mr. Collier, brings them into her office, tries to calm him down, reminding him, you just need to follow your supervisor's orders. You need to work in Pod D. That's where the patients need you. So all of this happens. Then Mr. Reyes goes back to Richard Setzel's office. He's still not there, but Ms. Kuloglu is still there, and together they make the decision to call the police. So Human Resources was notified of this incident. They investigated this incident, and after gathering numerous witness statements from all of these people, also there was a nurse, Paige Higgins. Her statement's in the record at 1196, where she also talks about how she saw Mr. Collier exchanging words with Mr. Reyes and walking away, extending his phone at him and then taking it back. All of this evidence provided Parkland with a sufficient basis to determine that this employee was insubordinate. And given the fact that he had already had a final warning, and also that our corrective action policy provides for immediate termination for insubordination, that termination was appropriate. They recommended that to the interim vice president, Brandon Bennett, and to Mr. Setzel, and they made the decision to terminate him. Now, Collier alleges that the following evidence supports his termination was somehow a pretext for retaliation. But again, they all fail. Again, he cites a police report, but it's not the police report related to the termination. It's the police report related to the final warning, and trying to say, well, the police found no crime had been committed. But, one, that's immaterial, what happened with the police, because that was a completely separate track and not relevant to what HR investigated and determined. But, two, that police report he cites, too, had to do with the final warning, not the termination. And he also tries to make it seem like this could be a direct evidence of retaliation case by citing to Mr. Reyes' testimony. But again, Mr. Reyes was asked about the testimony, the statements he provided to the police who came after the punching the wall incident with the final warning. And what's also important to know is that when the police came after they were notified that this employee had punched a wall, two other employees had reported to the police that they had heard Mr. Collier make threats, make threats against management, something about snapping their necks, and they were scared. And so when the police asked Mr. Reyes, have you heard of him making any kinds of threats like this, his answer was, no, I have not, I've just become this person's supervisor, but I have heard him make complaints about being treated unfairly and about it being based upon race. Now, he tries to take that statement from Mr. Reyes to somehow show that that definitely establishes he got the termination. He would not have been terminated but for engaging in predicted activity, but that just does not follow. The record cites the evidence just does not support that at all. It's a complete misstatement of the record. And again, Mr. Reyes was not the decision-maker for the termination. The decision-maker for the termination was Mr. Bennett, the interim vice president, and Mr. Setzel. So then what is he left with? It's his subjective belief and his persistence that he wasn't insubordinate. But that is not sufficient, and the courts are not here to second-guess business decisions, and he has not provided enough facts to show that but for predicted activity, he would not have been terminated. And if your honors have no further questions, that's all I have. Thank you. Thank you. Mr. Elwanger. In my opening argument, your honors requested a specific record cite as to the swastikas that are at issue in this case. That may be found at ROA 1559 through 1561. Those pictures were also a part of plaintiff's summary judgment response briefing in this case. The district court absolutely saw that. They saw those pictures but disregarded them. And what's important about how the district court disregarded them in this case and finding that summary judgment was appropriate for the hostile work environment claim lodged by Mr. Collier is the district court ignored what I think this court has begun to ask questions about, specifically Judge Costa, which is that the ongoing effect of having racial graffiti in the workplace that is not immediately covered up has an increasingly burdening effect on an employee. Well, what do you do with the plaintiff's concession that seeing these things only affected him by 1 percent? Did he say that or did he not? He did say that as part of a four-page discussion in his deposition where the district court cited those particular lines but failed to cite the other four pages of discussion that Mr. Collier said to give context to that statement, specifically what Mr. Collier said in that same area of the deposition, which is ROA 264. After saying that it was maybe just 1 percent that affected him, he also said this, I pride myself on being able to not worry about stuff or I can go on and on, this or that. But as I went through this, I found out I wasn't as tough as I thought I was, as you know, what I wanted to believe. Absolutely, he did say as part of a four-page part of his deposition that maybe it just affected him 1 percent. But the rest of his testimony that was disregarded by the trial court talks about seeing a counselor, losing sleep, having it affect him every day. And as the Northern District of Texas, the sister court to the court that issued this opinion, stated in the EEOC v. Rockton Services case, if the graffiti remains over an extended period of time or the employer's response is repeatedly ineffective in eliminating the racist graffiti, a fact question arises as to the reasonableness of the employer's response and whether additional investigative and ameliorative actions were warranted. That's important in this case, Your Honor, because there were no investigations or ameliorative actions taken by Parkland Hospital when it comes to the graffiti. And I do want to clarify something that was raised in the last argument regarding the frequency that Mr. Collier was required to view these swastikas. Specifically on page 121 of his deposition, which is record site 263, Mr. Collier stated that at least once a week I would be in there three or four times per day at least. Continuing on that he would be there regularly, maybe once or twice per week. Yeah, we definitely, that was the way our rotation went around. So there is testimony in the record that at once or twice per week, four to five times per day for over six months, Mr. Collier was required to see those swastikas. And the impact of that is also laid out by a decision... What color were the walls? I'm sorry, Your Honor? What color were the walls? They were drywall, Your Honor. So unpainted drywall. I believe they were more of a gray scale, but the swastika was actually carved into it where it could be very easily seen. And a review of the record will show that these pictures are not subtle. It's not a draped Nazi flag, Your Honor. We'll absolutely admit to that. But they were noticeable. They were two feet by two feet square. And more importantly to the analysis of this court, Director Stetzel of Parkland Hospital testified that he saw them, that he knew they were offensive, that they violated Parkland Hospital's policy, and that knowing all of that he still chose to do nothing. And that is what implicates a severe and pervasive hostile work environment that we have here. Specifically, and again, just as to the retaliation claims, what it is important to note is that although the radios may or may not have been working, Mr. Collier said they were not. And so a subsequent investigation that proved they were not, where the hospital again tried to write them up, is instructive and that a jury should be allowed to consider that evidence in determining the retaliation claim. Finally, Your Honors, again, Mr. Collier comes here not seeking an extension of Fifth Circuit authority, but merely the application of existing Fifth Circuit authority. And in so doing, his case should be reversed and remanded. Okay. Thank you very much. With that, the court's adjourned.